NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220770-U

NO. 4-22-0770

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| HEIDI LEITZEN, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | McLean County |
|     and | ) | No. 20D469 |
| JOHN LEITZEN, | ) | |
|     Respondent-Appellant. | ) | Honorable |
| | ) | Amy L. McFarland, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice DeArmond and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1  *Held*: The appellate court affirmed, concluding the circuit court did not abuse its discretion when it (1) denied maintenance to the respondent, (2) allocated the petitioner her entire pension, (3) ordered the petitioner's retirement account be divided via a qualified domestic relations order, and (4) admitted certain evidence pertaining to the petitioner's health.

¶ 2  Respondent, John Leitzen, appeals from the McLean County circuit court's judgment dissolving his marriage to petitioner, Heidi Leitzen. On appeal, John argues the court erred when it (1) denied his request for maintenance; (2) awarded Heidi her entire pension; (3) required the equalization payment due and owing from Heidi to be paid to John from a qualified domestic relations order (QDRO) instead of cash funds; and (4) admitted evidence that was not relevant, not previously disclosed, or inadmissible hearsay. Heidi responds the court committed no errors and the judgment should be affirmed. We affirm the court's judgment.

¶ 3                              I. BACKGROUND

¶ 4          John and Heidi married in June 1999. Heidi is eight years older than John and has

two children from a previous marriage. During their marriage, John and Heidi had two children

together, who are now adults. In December 2020, John and Heidi separated after Heidi filed a

petition for dissolution of marriage on the basis irreconcilable differences caused the irretrievable

breakdown of the marriage. In April 2021, the parties sold the marital residence. In December

2021, John filed a motion for temporary and permanent maintenance under section 504(a) of the

Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(a) (West 2020)).

¶ 5                        A. Hearing on All Remaining Issues

¶ 6          Over three dates in February 2022, March 2022, and June 2022, the circuit court

conducted a final hearing on all remaining issues, including (1) the distribution of marital

property and (2) John's request for maintenance. A summary of the evidence presented at the

hearing follows.

¶ 7                              1. *Heidi's Testimony*

¶ 8          Heidi testified she currently resided in Heyworth, Illinois, where she lived with a

friend. At the time of the hearing, Heidi was 56 years old and had been employed as a senior

compliance analyst at State Farm Mutual Automobile Insurance Company (State Farm) in

Bloomington, Illinois, for 30 years. Before marrying John, Heidi had been working at State Farm

for seven years and earned her bachelor's degree from Illinois State University.

¶ 9          Heidi testified she was not planning to continue her employment with State Farm

and had been approved for a retirement date of July 1, 2022. Heidi had her last day of work

shortly before the final hearing because she had planned to use her outstanding paid time off

before her official retirement date. During this *vacation* time, Heidi would be paid her salary, but she would begin receiving a pension from State Farm once she retired.

¶ 10     Heidi explained she elected to retire before she was eligible for social security benefits because she felt "outpaced" by changes State Farm had implemented in recent years. As technology changed, she found it hard to try to keep up. Additionally, her supervisor had expressed concern regarding the amount of time it was taking Heidi to perform her assigned tasks. At this point, John objected to Heidi's testimony on the basis it was inadmissible hearsay and Heidi failed to previously disclose any "impairment in regard to employment." The court overruled John's objection, finding that Heidi's testimony did not go to the truth of whether she had an impairment to employment, but instead "her basis and reasoning for choosing to retire." Heidi then continued as follows:

> "So, I am struggling with not being able to keep up with all of the changes. I can't do things as fast as I used to. I am not picking up on all of it. I am falling behind. I am getting comments from my boss. It is like I cannot do anything right. Nothing."

¶ 11     John again objected, and the circuit court again overruled the objection. The following exchanges then ensued:

> "MS. WOOD [([HEIDI'S COUNSEL)]: Do you feel that the atmosphere where you are located within your Department has changed in a positive way or a negative way in the last few months?
>
> MS. MOSBY-SCOTT [(JOHN'S COUNSEL)]]: Objection, relevance.
>
> THE COURT: I will allow it.
>
> [HEIDI]: It is changed in a very negative way.

MS. WOOD: Can you explain without talking about anything anybody has said from a third party standpoint how you are feeling the cohesiveness of your Department has been working for the last several months?

A. It hasn't. Everyone is out for themselves. No one has anyone's back.

MS. MOSBY-SCOTT: Objection.

A. If there is a mistake made—

THE COURT: Hold on. So when there is an objection, I am just going to ask you to stop speaking and let me deal with the objection.

MS. MOSBY-SCOTT: How can she testify that no one else in her Department has anyone else's back. She has no foundation to be able to attest to that.

THE COURT: I am going to allow her to—really, this goes to the heart of why she is retiring. So they are her beliefs, her feelings, they are her perceptions related to that. I am not taking that as the truth of the matter asserted. Really, the question is why are you retiring now. I think we can probably move on a little bit from much of this without having to go into the same amount of detail.

MS. WOOD: Sure.

THE COURT: But for that purpose, I will overrule."

John's counsel continued to object, and the court recognized John's continuing objection. Heidi's counsel then continued direct examination, as follows:

"Q. Okay. How is this impacting you, your continuing work at State Farm, or now you are not doing it anymore, but how was your continuing work with State Farm affecting you physically and emotionally if at all?

A. The stress. My blood pressure is off the charts. I am on four different blood pressure medications now. But it is [*sic*] still keeps spiking to up to 200 and something over a hundred and something. We can't get that resolved. I am a cancer survivor.

MS. MOSBY-SCOTT: I am going to object. She provided no health records whatsoever in discovery.

MS. WOOD: You don't have to present health records to talk about your cancer diagnosis and treatment.

MS. MOSBY-SCOTT: Well, in regard to your blood pressure, if you are alleging in trial that it is a basis for your impairment to produce income, you do have to disclose it.

THE COURT: I don't think she is presenting it as an impairment. I think she is addressing the impact of her work environment on her health. I am going to allow it."

Thereafter, Heidi testified she was diagnosed with bilateral breast cancer in 2015 and received chemotherapy treatments over the course of four or five months. She also underwent a double mastectomy and reconstruction. According to Heidi, her health history impacted her decision to retire from State Farm because "of the stress and the fear that [the cancer] would return."

¶ 12 Moreover, Heidi explained that several years before her cancer diagnosis, she and John had discussed her desire to retire in her mid-fifties. Because John was self-employed with

his construction business, Heidi asked John to consider obtaining different employment to ensure the family had health insurance, as her retirement benefits would only cover her own health insurance. Once she was diagnosed with cancer, she again asked John to contemplate finding a job with benefits, as she was "very concerned that something would happen to [her] and that they wouldn't have health insurance coverage."

¶ 13        Heidi did not believe John had done anything to advance her education or her career at State Farm. He was not responsible for any domestic duties that allowed her to advance in her career, and had she not been married to him, she believed she would have been able to make the same advancements.

¶ 14        Turning to John's employment, Heidi testified that when they were first married in 1999, John was employed at West Side Forest Products as a salesman, where he earned a salary comparable to her own. Sometime between 2006 and 2008, John started his own online business selling cedar products, and later his own construction business, Leitzen Construction. According to Heidi, she and John discussed him potentially obtaining a job with benefits approximately once per month from 2015 until they decided to divorce in 2020. Specifically, Heidi encouraged John to apply for job opportunities at the local school as a custodian and at the grocery store, but John was not interested.

¶ 15        During their marriage, she and John maintained separate bank accounts except for a joint savings account. Heidi was the bookkeeper for the home finances, and John maintained the books for his businesses. Heidi did not know how much income John earned from his businesses, but he contributed $550 per week to their shared household expenses according to a budget they prepared. Neither she nor John ever quit their respective jobs to care for the children,

and she maintained they shared those responsibilities equally. Heidi opined that having two children did not impact her or John's employment prospects.

¶ 16       When she and John sold the marital residence in April 2021, the funds realized from the sale were deposited into the closing attorney's trust account. Heidi proposed that instead of equalizing their bank accounts, she and John should each be awarded the separate accounts they had maintained throughout the marriage. Additionally, Heidi was concerned that John had not reported all his sources of income because he was often paid in cash. According to John's financial affidavit, he earned around $1900 and $1600 in June 2021 and October 2021, respectively. Heidi explained that it was unlikely John would have been able to pay the $550 he contributed to the household per week—on top of his other expenses—if he earned only the amounts on his financial affidavit. Before they separated in 2020, John periodically worked as a bartender at Prairie Fire Grill at least two nights per week. John did not report any cash tips in his financial affidavit.

¶ 17       Heidi proposed that she and John each keep their own individual retirement accounts because they had always kept those accounts separate during their marriage. Additionally, John had at least eight additional years to work and save for retirement, even if he retired at the same age as Heidi.

¶ 18       From 2019 to 2021, in addition to her State Farm employment, Heidi worked part-time at the public library. At this job, Heidi earned approximately $2600 per year and used the extra money to visit her mother in Florida. Heidi quit in 2021 because she was "tired," "stressed," and determined the extra work was not beneficial for her health.

¶ 19       At the beginning of the COVID-19 pandemic in March 2020 when stay-at-home orders were in place, Heidi worked remotely. While working at home, Heidi observed John's

work schedule and found that he generally slept in late and was often home most of the day. Heidi did not know the value of John's construction business because she had not asked to receive any portion of it. However, Heidi noticed John's business bank account statements reflected that John had drawn from his business account for personal expenses.

¶ 20 On cross-examination, Heidi acknowledged John had surgery to remove an eight-pound tumor, which negatively affected his ability to work for several months in 2019. He did not make his usual weekly $550 payments to Heidi during his recovery. In December 2020, when Heidi and John separated, John remained in the marital home with the two children, while Heidi moved in with a friend. She did not pay rent to her friend while separated from John but purchased groceries for her friend's household and paid to have the pool prepared for the summer. Upon the conclusion of the divorce proceedings, Heidi planned to find her own place to live.

¶ 21 During the marriage, Heidi acknowledged she obtained several insurance designations and certifications related to her work at State Farm. She studied for the required exams for those certifications at home and at the Heyworth Public Library. When asked when she made the decision to specifically retire in July 2022, Heidi responded, "That has just came up over the last few months as things got so incredibly bad at work. I was trying to hold on as long as I could. I have always worked." Heidi explained further, "I made the decision to retire when I became fearful for my job if I didn't. And I don't want to leave on bad terms from anywhere. That is not who I am. I am not someone who wants to get fired." Heidi admitted she had not provided any documentation to the court establishing she had received a negative performance review. To the contrary, Heidi testified she was rated as "meet[ing] expectations" in her December 2021 review. Admittedly, Heidi had not sought out additional resources at work to

improve her skills and performance. Heidi insisted that when she said she would "quit [her] job before [she] would give [John] any portion of [her] pension and pay him maintenance," she was referring to her job at the library.

¶ 22　　　　On redirect examination, Heidi explained her annual income would be reduced by around $70,000 upon her retirement. Accordingly, it would not make "economic sense" for her to forgo her $93,000-per-year salary at State Farm merely to avoid paying John $21,000 in maintenance out of spite or revenge. Heidi asserted John was skilled in his job and could provide for his own needs.

¶ 23　　　　　　　　　　　　　2. *John's Testimony*

¶ 24　　　　Next, Heidi called John as a witness. On direct examination by Heidi's counsel, John testified he was currently residing with his two adult children at a low-income apartment in Heyworth, where he had lived since he and Heidi sold their marital home. John hoped to purchase a home upon the conclusion of the divorce proceedings. According to John, the $1951 per month listed in his financial affidavit was all the economic benefit he received from his construction business. John did not include his wages or tips from Prairie Fire Grill in his financial affidavit because he had not worked there since September 2021. John admitted he did not provide any log of the tips he earned there and claimed he did not know how much he typically earned in tips on a given night.

¶ 25　　　　At the time of his testimony, John was exclusively working for his construction business, which was experiencing a "very serious economic crunch trying to get materials in." Although business was slow, John chose not to continue bartending. John preferred to work for himself and liked to be his own boss.

¶ 26　　　　According to John, he "r[a]n a pretty clean ship" with respect to his business accounting. He did not derive any economic benefits from his company over and above the net after-business expenses and draws. When asked about the check details from his business account, John agreed he had written checks from his business account for his divorce attorney fees, dining out, and his contributions to weekly and monthly household expenses. John explained, "I am using [my business account] as my personal account, and I also claim it all on taxes." When asked about expenditures at Par-A-Dice casino in Peoria, Illinois, John explained he did not write those expenses off as business expenses but rather reimbursed the business account from his personal account the next day. John did not typically use his personal account because it did not contain any money.

¶ 27　　　　John acknowledged Heidi used her income and benefits from State Farm to provide for the family's expenses and health insurance. They had attended a retirement seminar at State Farm "five years ago," but John indicated he did not know when Heidi was going to retire. When asked "what, if any, resumes, or applications, or requests for employment" John had made since Heidi had filed the petition to dissolve the marriage, John responded, "I haven't had to—I am not going to go out and fill out an application because I am working for myself."

¶ 28　　　　On cross-examination by his own counsel, John explained that when he worked at Prairie Fire Grill, he was not paid $10 per hour plus 100% of tips. Instead, it was "tips minus the $10 an hour" if his credit card and cash tips exceeded the hourly rate. Accordingly, the amount shown on John's pay stubs constituted the entirety of his compensation.

¶ 29　　　　John admitted Heidi suggested he apply at Kroger during the COVID-19 pandemic because he was unable to complete construction jobs during the governor's stay-at-home orders. He also acknowledged Heidi had proposed he apply for a custodian position at the

local school because it came with benefits. John did not pursue that job because he did not like to be in the same spot every day and he enjoyed his carpentry work.

¶ 30　　　　Subsequently, on direct examination by his own counsel, John testified, when the proceedings concluded, he planned to stay in Heyworth and purchase a home in the $90,000 to $100,000 range. In contrast, John and Heidi sold their marital home for $235,000. John hoped to use funds held in trust following the sale of the home as a down payment.

¶ 31　　　　When Heidi studied for the exams related to her employment, John made sure the house was quiet and would cook dinner. When the children were in school, Heidi typically left for work around 6:30 a.m. Because of her schedule, John ensured the children were dressed and brought them to the bus stop in the morning and met them at the bus stop or picked them up in the afternoon. John did most of the laundry and cooking. Heidi scheduled and coordinated the children's doctor's appointments; however, John typically drove the children to those appointments and stayed home with them if they were sick. John estimated he performed about 75% of the domestic responsibilities and was responsible for lawn maintenance and weeding. According to John, he also completed several renovations on their most recent marital residence, such as installing tile flooring, roofing, and re-sheeting the deck.

¶ 32　　　　John did not recall Heidi ever telling him that she intended to retire in 2022. However, during an argument in January 2021, John claimed Heidi stated she would rather quit State Farm than pay maintenance to him. John proposed the circuit court divide Heidi's pension between them via a QDRO, equally divide the proceeds from the sale of the marital home, and require any equalization payment from Heidi to John to be paid from Heidi's one-half share of those marital home funds. John also acknowledged a portion of his business income had not been reported correctly on his 2018, 2019, and 2020 tax returns and had no objection to filing

amended returns to correct the issue. John admitted this would lead to a greater tax liability and agreed to split that deficiency with Heidi.

¶ 33                                    3. *Closing Arguments*

¶ 34            In closing, Heidi argued John was not entitled to maintenance. Specifically, she asserted John's testimony he earned only about $10,000 per year was not credible and his income was substantially more than what he submitted to the court and to the Internal Revenue Service. Additionally, based on his financial affidavit, John had not incurred any significant debts since separating from Heidi despite claiming living expenses of around $40,000 per year. Using John's profit and loss statements, Heidi estimated John's gross annual income averaged around $50,000 per year. According to Heidi, the court should not order her to pay maintenance to John because based on the statutory factors, each of the parties could meet their modest needs on their own. Their marriage did not impact John's educational or vocational opportunities. While John enjoyed his construction and bartending work, Heidi was unhappy and struggling to keep up her work performance after 30 years at State Farm. She believed it would not be equitable to divide her pension with him, especially since Heidi had been working for State Farm for years prior to meeting John.

¶ 35            John argued the circuit court should order Heidi to pay him maintenance. He emphasized he had worked flexible hours to accommodate Heidi's higher-earning job and took on a greater portion of domestic responsibilities and childcare. Further, John argued maintenance was appropriate because Heidi chose to retire early in bad faith after telling John she would quit her job before paying him maintenance. In addition, he asserted Heidi had not presented any evidence, other than her own testimony, showing her job was at risk due to poor performance. Moreover, John testified Heidi had never indicated to him she intended to retire in 2022, and

Heidi had not provided any documentation to the court to confirm she would be retired on the date she specified. Consequently, John maintained income should be imputed to Heidi at the time she quit State Farm.

¶ 36    The circuit court thereafter took the case under advisement.

¶ 37                    B. Circuit Court's Judgment

¶ 38    At the June 2022 hearing, the circuit court announced its judgment. The court awarded each of the parties their respective bank accounts. Heidi was awarded her pension and John his individual retirement account. It also determined the proceeds from the sale of the marital home should be divided equally between the parties. Based on the court's inventory, it ordered an equalization payment of $51,000 be paid to John from Heidi's State Farm 401k via a QDRO.

¶ 39    After discussing the statutory maintenance factors, the circuit court denied John's request for maintenance. Specifically, the court found Heidi's testimony regarding her decision to retire was credible and that the decision was reasonable given her history of breast cancer and the difficulties she experienced keeping up with new technology at State Farm. The court determined John was "completely employable," did not require any additional job training, and had not experienced any impairment in his earning capacity by virtue of taking on domestic or childcare responsibilities.

¶ 40    The circuit court also ordered the parties to file amended 2021 federal and state tax returns to properly account for all of John's income.

¶ 41    This appeal followed.

¶ 42                    II. ANALYSIS

¶ 43        On appeal, John argues the circuit court erred when it (1) denied his request for

maintenance, (2) awarded Heidi her entire pension, (3) ordered the equalization payment to be

paid from Heidi's 401k via a QDRO rather than from cash proceeds from the sale of the marital

home, and (4) admitted certain evidence at the final hearing. Heidi responds that no errors

occurred, and the court's judgment should be affirmed. We agree the court did not abuse its

discretion and affirm its judgment.

¶ 44                    A. Denial of John's Maintenance Request

¶ 45                        1. *Applicable Law*

¶ 46        Section 504(a) of the Act (750 ILCS 5/504(a) (West 2020)) provides that in a

dissolution proceeding, the circuit court "may grant" maintenance in an amount and for a period

of time "as the court deems just." "[T]he propriety of a maintenance award is within the

discretion of the trial court and the court's decision will not be disturbed absent an abuse of

discretion." *In re Marriage of Schneider*, 214 Ill. 2d 152, 173, 824 N.E.2d 177, 189 (2005). An

abuse of discretion occurs where "no reasonable person would agree with the trial court's

decision." *In re Marriage of Donovan*, 361 Ill. App. 3d 1059, 1064, 838 N.E. 2d 310, 315

(2005). In turn, "[w]hen a party challenges the trial court's factual findings, a reviewing court

will affirm unless the court's findings were clearly against the manifest weight of the evidence."

*In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1041, 899 N.E.2d 1097, 1103 (2008). A finding

is against the manifest weight of the evidence when the opposite conclusion is clearly apparent.

*In re Marriage of Palarz*, 2022 IL App (1st) 210618, ¶ 28. When reviewing the circuit court's

factual findings, this court is not to substitute its judgment for that of the circuit court on matters

of witness credibility, the weight to be given evidence, and the inferences to be drawn from the

evidence, even if the reviewing court would have reached a different conclusion if it had been the trier of fact. See *In re A.W.*, 231 Ill. 2d 92, 102, 896 N.E.2d 316, 322 (2008).

¶ 47       To determine whether a maintenance award is appropriate, section 504(a) sets forth certain factors for the circuit court to consider, including:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2020).

¶ 48 Generally, the needs of a party seeking maintenance are measured by the standard of living established during the marriage. *In re Marriage of Selinger*, 351 Ill. App. 3d 611, 618-19, 814 N.E.2d 152, 160 (2004). When considering the first factor—*i.e.*, the income and property of each party—the court may impute income to the party against whom maintenance is sought under any of the following three circumstances: "(1) the payor has become voluntarily unemployed, (2) the payor is attempting to evade a support obligation, or (3) the payor has unreasonably failed to take advantage of an employment opportunity." *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30, 59 N.E.3d 135. The circuit court's decision whether to impute income is reviewable for an abuse of discretion. See *In re Marriage of Lichtenauer*, 408 Ill. App. 3d 1075, 1091, 945 N.E.2d 119, 132 (2011).

¶ 49                                    2. *This Case*

¶ 50                          a. Imputation of Income to Heidi

- 16 -

¶ 51    First, we conclude the circuit court's decision not to impute income to Heidi due to her early retirement was not an abuse of discretion. Although the court seemingly found Heidi voluntarily retired, it also found her testimony regarding her motivations to retire to be credible and reasonable under the circumstances—and therefore her retirement did not warrant the imputation of income. The record showed Heidi had worked at State Farm continuously for 30 years. Over this period, State Farm's technology practices changed dramatically, and Heidi underwent chemotherapy and a double mastectomy following her breast cancer diagnosis. Although Heidi had not received negative performance reviews, she indicated she was incapable of keeping up with the new demands of her job. John insisted Heidi could presently obtain comparable employment to State Farm, but Heidi believed she would face the same difficulties at another insurance job that she currently faced at State Farm. Given her previous health issues, the court found credible Heidi's testimony that the increased stress from this type of job could negatively impact her health despite the fact she was presently healthy.

¶ 52    The circuit court also accepted John's testimony that Heidi stated she would quit her job before paying him maintenance. However, it did not believe Heidi decided to retire in bad faith, *i.e.*, to avoid any financial obligation to John. See *In re Marriage of Kowski*, 123 Ill. App. 3d 811, 814, 463 N.E.2d 840,843 (1984) ("Good faith is not shown where it can be determined that the change has been prompted by a desire to evade financial responsibilities to the supported spouse."). The court found Heidi's statement to John was not her actual motivation for retiring but instead a statement made in the heat of an argument during contentious divorce proceedings. This statement was alleged to have occurred in January 2021, and John did not file for maintenance until December 2021. Heidi testified she always intended to retire early—which explained why she had repeatedly asked John to seek additional employment that would provide

benefits for him and the children. In his testimony, John acknowledged Heidi had pressured him to obtain additional employment because he knew that when Heidi retired, he would not be eligible for health insurance. The parties agreed they both attended a retirement seminar through State Farm five years before the proceedings in this case, which also supported the court's finding that Heidi always intended to retire in her mid-fifties and John was aware of that intention. In fact, Heidi ultimately retired three years after she initially intended. The record therefore supported the court's finding Heidi's decision to retire was reasonable. Because the opposite conclusion is not readily apparent here, its finding was not against the manifest weight of the evidence.

¶ 53　　As stated above, a reviewing court is not to substitute its judgment for that of the circuit court on matters of witness credibility, the weight to be given evidence, and the inferences to be drawn from the evidence, even if the reviewing court would have reached a different conclusion had it been the trier of fact. See *A.W*, 231 Ill. 2d at 102. The court here found Heidi's retirement was reasonable under the circumstances and not done in bad faith. Accordingly, its decision not to impute income to her based on those findings was not an abuse of discretion.

¶ 54　　　　　　　　　　　　b. Remaining Factors

¶ 55　　Turning to the remaining maintenance factors, the circuit court's denial of John's request for maintenance was also not an abuse of discretion.

¶ 56　　At the hearing, the circuit court considered each of the maintenance factors listed in section 504(a) of the Act (750 ILCS 5/504(a) (West 2020)). The court initially evaluated the income and property apportioned to the parties. Specifically, John would receive half the proceeds from the sale of the marital home and was awarded his individual retirement account. The court also contemplated Heidi's contention that John did not report some of his income and

could earn more income than he presented to the court. The needs of the parties were modest, they did not have significant debt, and neither party would have a significant financial burden upon dissolution.

¶ 57    Regarding the third factor—the realistic future earning potential of each of the parties—the circuit court found John had "chose[n] not to be a bartender," had not sought any employment outside of his construction business, and had left previous employment because he "didn't like being told what to do." The court determined John "has the choice as to what kind of income he has and has another additional 8 to 10 years in order to continue to add to his employment." In contrast, the court found Heidi was retired and struggled to "keep up in the modern culture of technology."

¶ 58    As to the factor of impairment in earning potential due to devoting time to domestic responsibilities, the circuit court did not find John had suffered any such impairment. Instead, John contributed to domestic responsibilities, such as preparing the children for school and cooking meals, *by virtue of* having a flexible schedule with his self-employment—not as an alternative to paid employment outside the home. Additionally, John never testified he had to forgo the pursuit of educational or other vocational opportunities because of time spent caring for the children or the home. The court determined it would not be necessary for John to seek additional job training, education, or other skills to improve his earning potential. The court opined John was skilled in construction, and with the end of COVID-19 restrictions, John had ample opportunity to develop his business.

¶ 59    The circuit court evaluated the standard of living established during the parties' over 20-year marriage and found it to be modest. It also emphasized the parties always kept separate bank accounts, contributed to their own retirement, accumulated some savings, and did

not have significant debt. Although John watched the children when Heidi studied for her professional certifications, the cost was covered by her employer and such additional domestic duties "[did] not rise to the level that maintenance would be appropriate."

¶ 60        The record does not establish the opposite conclusion was apparent as to any of these findings, which were supported by testimony the circuit court found credible, as well as financial affidavits and other exhibits admitted at the hearing. The court determined Heidi was not in a substantially superior financial position to John given her retirement and John's relative youth and earning potential. It was entirely possible that John could earn more by expanding his construction business, bartending, or considering other additional employment. Although the record supports a finding John contributed substantially to household responsibilities, the court found those contributions did not result in any impairment to John. The record fails to demonstrate John sacrificed opportunities to advance in his career or education because of those domestic efforts. Finally, although the court did not specifically state whether it determined John earned more than he reported to the court, it ordered the parties to amend their tax returns because it noticed errors with John's bookkeeping practices for his business. The court's denial of John's request for maintenance was not unreasonable given its factual findings and therefore not an abuse of discretion.

¶ 61                                B. Distribution of Assets

¶ 62        John next challenges the circuit court's distribution of the parties' marital assets.

¶ 63                                1. *Applicable Law*

¶ 64        "The [trial] court has broad discretion in the distribution of marital assets." *Walker*, 386 Ill. App. 3d at 1042. On review, the court's division of marital assets will not be disturbed absent an abuse of that discretion. *In re Marriage of Thornley*, 361 Ill. App. 3d 1067,

- 20 -

1071, 838 N.E.2d 981, 985 (2005). As stated above, an abuse of discretion occurs where "no reasonable person would agree with the trial court's decision." *Donovan*, 361 Ill. App. 3d at 1064.

¶ 65    Under section 503(d) of the Act, a circuit court is to divide marital property by considering the following factors:

"(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property ***;

***

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having the primary residence of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any prenuptial or postnuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d) (West 2020).

¶ 66          Ultimately, "[t]he touchstone of proper apportionment is whether it is equitable, and each case rests on its own facts." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121, 968 N.E.2d 115. "An equitable division does not necessarily mean an equal division, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result." *Id.* Additionally, the Act, "whenever possible, seeks to cut off all entanglements between the parties so that they may each go their separate ways in life." *In re Marriage of Simmons*, 187 Ill. App. 3d 651, 659, 409 N.E.2d 321, 327 (1980).

¶ 67                              2. *This Case*

¶ 68          John asserts the circuit court abused its discretion when it (1) awarded Heidi her entire pension and (2) required the equalization payment due and owing from Heidi be paid to John from her 401k pursuant to a QDRO instead of cash funds from the sale of their home.

¶ 69                              a. Pension Award

¶ 70          First, John argues the circuit court abused its discretion when it awarded Heidi her entire pension despite the fact it was marital property and subject to division under section 503(d) of the Act.

¶ 71          " '[M]arital property' means all property, including debts and other obligations, acquired by either spouse subsequent to the marriage." 750 ILCS 5/503(a) (West 2020). Additionally, "all pension benefits (including *** defined benefit plans ***) acquired by or participated in by either spouse after the marriage and before a judgment of dissolution of marriage or legal separation or declaration of invalidity of the marriage are presumed to be marital property." *Id.* § 503(b)(2).

¶ 72        The record shows, under section 503(b)(2) of the Act, the portion of Heidi's

pension that accrued during her marriage to John was marital property. See *id*. Heidi testified she

was entitled to her benefit plan through State Farm, where she worked for the entirety of the

marriage. Because she "participated in" her defined benefit plan "after the marriage and before a

judgment of dissolution of marriage," it was presumably marital property under section 503(b).

*Id.*

¶ 73        Although a portion of Heidi's pension was presumed marital property under the

Act, the circuit court was not required to divide it for its distribution of the parties' marital

property to be equitable. The record showed under her pension, Heidi was to receive about

$2000 per month. The court found this would be her sole source of income during her upcoming

retirement. In contrast, John was eight years younger than Heidi, was awarded his construction

business, and had many more working years ahead of him if he wished to retire at the same age

as Heidi. The court ruled John had the earning potential to meet his needs, which were modest.

The court also awarded him half of the proceeds from the sale of their home and a portion of

Heidi's 401k, which resulted in each of the parties having relatively equal retirement funds.

Although John claimed Heidi's current housing was much closer to their previous standard of

living compared to his situation, the record showed Heidi only resided there temporarily, and she

intended to provide for her own housing upon conclusion of the dissolution proceedings.

Although the court could have chosen to divide the marital portion of Heidi's pension plan, its

decision to award it to Heidi was equitable under the circumstances given her pension income

was comparable to John's claimed income from his construction business (approximately $1900

per month according to John). Moreover, the court's decision was aligned with the Act's goal of

ending further entanglements between the parties, if possible. The court's findings were not

against the manifest weight of the evidence, and its decision to award the pension to Heidi was not an abuse of discretion.

¶ 74                                    b. Equalization Payment

¶ 75        John also argues the circuit court abused its discretion when it ordered his $51,000 equalization payment be paid from Heidi's 401k subject to a QDRO because such a disposition was not authorized under Illinois and federal law.

¶ 76        Generally, under 12-1006 of the Code of Civil Procedure (735 ILCS 5/12-1006(a) (West 2020)), "[a] debtor's interest in or right *** to *** payments under a retirement plan is exempt from judgment." However, section 1056(d) of the Employment Retirement Income Security Act of 1974 (ERISA) (29 U.S.C.A. § 1056(d) (2020)) provides that a valid QDRO creates or recognizes a former spouse's right to receive "all or a portion" of benefits payable to a participant under a qualifying retirement plan. The parties do not dispute Heidi's 401(k) was a qualifying plan under ERISA. Additionally, "our supreme court has held that it is 'beyond dispute' that retirement benefits are marital property to the extent that the beneficial interest was acquired during the marriage." *In re Marriage of Thomas*, 339 Ill App. 3d 214, 227, 789 N.E.2d 821, 830 (2003) (quoting *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 303, 735 N.E.2d 560, 567 (2000)).

¶ 77        John correctly notes a QDRO cannot be used "for any purpose other than an equitable division of the retirement asset or collection of child support and maintenance arrears" and cites several cases pertaining to the erroneous use of a QDRO to satisfy certain debts to third-party creditors. See *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 92, 35 N.E.3d 1178 (erroneous liquidation of 401(k) to pay attorney fees); see also *In re Marriage of Radzik*,

2011 IL App (2d) 100374, ¶ 64, 955 N.E. 2d 591 (erroneous liquidation of individual retirement to pay attorney fees).

¶ 78        The circuit court's issuance of the QDRO was not improper here because it was used to equitably divide a marital asset. The court had broad discretion to allocate a portion of Heidi's 401(k) because it was considered marital property. See *Thomas*, 339 Ill App. 3d at 227; see also 750 ILCS 5/503(b)(2) (West 2020). A QDRO provides the mechanism to accomplish such an allocation. See 29 U.S.C.A. § 1056(d). The record shows the $51,000 paid to John from Heidi's 401(k) would leave each party with relatively equal retirement funds of that type. John does not cite any law prohibiting the court from dividing a marital retirement account via a QDRO, and we find none exists. As stated above, the court's allocation of the parties' property was equitable under the facts, and we conclude no abuse of discretion occurred as a result.

¶ 79                            C. Admission of Evidence

¶ 80        Finally, John asserts the circuit court abused its discretion when it admitted evidence pertaining to Heidi's health. See *supra* ¶¶ 10-11. Specifically, John argues the court erred when it allowed Heidi to testify her job was so stressful that her blood pressure was "off the charts" because she presented no health records in discovery. John contends allowing this testimony prejudiced him because it prevented him from effectively cross-examining Heidi.

¶ 81                                1. *Applicable Law*

¶ 82        "A trial court's determination of the admissibility of evidence will be reversed if it is an abuse of discretion." *In re Marriage of Gurda*, 304 Ill. App. 3d 1019, 1028, 711 N.E.2d 339, 345 (1999). To be admissible, evidence must be relevant, meaning it "has logical probative weight tending to prove or disprove a fact in the case." *Id.* Additionally, "any out-of-court statement offered to prove the truth of the matter asserted therein is hearsay and inadmissible."

*In re Marriage of Hodges*, 2018 IL App (5th) 170164, ¶ 23, 103 N.E.3d 958. If the out-of-court statement is not offered for the truth of the matter asserted but for some other purpose, it is not hearsay. *Cundiff v. Patel*, 2012 IL App (4th) 120031, ¶ 30, 982 N.E.2d 175. Additionally, exceptions to the rule against hearsay include (1) statements of memory or belief to prove the fact remembered or believed and (2) statements of the declarant's then-existing state of mind to prove that state of mind at the relevant time. See Ill. R. Evid. 803(3)(A), (B) (eff. Sept. 28, 2018).

¶ 83                                    2. *This Case*

¶ 84          Here, the circuit court's admission of Heidi's statements regarding her blood pressure and the effect of stress from her job on her health was not an abuse of discretion. The court specifically found Heidi's statements were not being used to prove the truth of the matter asserted—*i.e.*, that her blood pressure had spiked to 200, requiring medication. Neither was it offered as proof of an impairment to earning future income. Instead, the testimony was offered to show Heidi's motivations for retiring, and therefore, it was not hearsay. The context of the testimony complained of was a broader line of questioning about Heidi's feelings of stress and her perception of State Farm's negative atmosphere. Even assuming the statements were hearsay, Heidi's emotions and physical sensations were relevant to her decision to retire from State Farm, and her testimony was therefore admissible under the hearsay exceptions outlined in Rule 803(3) (*id.*). Further, Heidi's decision to retire factored into the court's determination of whether maintenance was appropriate, whether income should be imputed to her, and the disposition of marital assets. Her reasoning underlying that decision therefore had "logical probative weight tending to prove or disprove" facts material to the issues presented in the proceedings. *Gurda*,

304 Ill. App. 3d at 1028. Because Heidi's testimony was both relevant and not inadmissible hearsay, the court did not abuse its discretion in admitting the evidence.

¶ 85　　　　　Finally, we commend the circuit court for its thorough and comprehensive analysis of the issues presented in this case, which we found especially helpful.

¶ 86　　　　　　　　　　　　III. CONCLUSION

¶ 87　　　　　For the reasons stated, we affirm the circuit court's judgment.

¶ 88　　　　　Affirmed.