(No. 56373.—

*In re* MARRIAGE OF GERALDINE OLSON, Appellee, and KENNETH OLSON, Appellant.

*Opinion filed June 9, 1983.*

Epton, Mullin, Segal & Druth, Ltd., of ·Chicago (Ronald S. Ladden, Mary F. Stafford, and Joel B. Bernbaum, of counsel), for appellant.

Maureen Flaherty, of Lehrer & Flaherty, of Wheaton, for appellee.

CHIEF JUSTICE RYAN delivered the opinion of the court:

This case concerns the disposition of property and the custody of a minor child in connection with a dissolution of

marriage. The parties, Geraldine Olson and Kenneth Olson, were married on July 14, 1970. Geraldine Olson petitioned for dissolution of the marriage on January 17, 1979. The marriage was dissolved by a judgment entered in the circuit court of Du Page County on April 1, 1980. The court entered a supplemental judgment on February 4, 1981, which, among other dispositions, assigned the marital residence to the petitioner, Geraldine Olson, as her nonmarital property, awarded her custody of the minor child, Kristin, and allowed her to remove the minor child from the jurisdiction. Respondent, Kenneth Olson, appealed from this supplemental judgment and a related temporary restraining order which required the wife to escrow only $10,000 of the funds received from the sale of the marital residence. The appellate court affirmed the judgment of the trial court by a Rule 23 order (73 Ill. 2d R. 23). (102 Ill. App. 3d 1202.) We granted Kenneth Olson's petition for leave to appeal.

One issue in this appeal involves the classification and disposition of the marital residence, 537 Park Row, Glen Ellyn, Illinois, and the proceeds from its sale. The parties resided at this address throughout their marriage.

In 1967 Geraldine purchased the home for $39,000. She bought it before her marriage to Kenneth, and contributed $3,000 to $4,000 from the sale of her former residence to the down payment. Her parents, Donald and Edith Zugenbuehler, contributed $12,000. She and her parents also obtained a $24,000 mortgage to finance the balance. The property was placed in a land trust. Geraldine had a one-third interest in the trust while her parents had a two-thirds interest.

Once the parties married, Kenneth lived in the house with his wife, her two sons from a former marriage, and a daughter, Kristin, from their marriage. While they were married, the couple extensively remodeled and decorated their home. Kenneth, who operated a construction com-

pany, did a substantial amount of this work. His subcontractors also donated their time to performing remodeling services. Geraldine's sons also contributed their labor.

During the marriage, Geraldine owned and operated an antique business. She also received social security, Veterans' Administration death benefits, Maywood fire department annuity benefits, and child-support payments. She paid for part of the remodeling work with a death benefit of $10,000 which she received when her first husband died. She established a segregated account with her own funds to pay for this work. Her husband did not financially contribute to it.

Geraldine contributed $302 per month to pay the house mortgage. During the early years of the marriage, Kenneth deposited his paycheck into a joint checking account from which family expenses, including mortgage payments, were paid. After the couple established separate checking accounts, however, he paid his wife approximately $300 to $375 per week from his salary for family living expenses, which he said included the mortgage payments.

To finance Kenneth's participation in a joint venture involving his construction company, the couple used the home as collateral for a $23,000 loan. The bank released the collateral after Kenneth repaid the loan.

In 1978 the couple also used the home as collateral for a $50,000 loan which was used to finance the purchase of two lots on which Old Colonial Homes, a company which the couple owned, planned to build a single-family home. The bank made the $50,000 check jointly payable. It is undisputed, however, that Kenneth received the entire $50,000. He endorsed the check with his signature, and a significant percentage of the money was disbursed to Olson Construction Company, which he solely owned.

In January 1979, Geraldine asked her husband to renegotiate the note, reduce the $50,000 balance, or repay the principal sum. She also told him that the bank intended to

foreclose the mortgage on the 537 Park Row property, which would deprive her children of their family home. Kenneth said, however, he would not help his wife to prevent foreclosure. He left the marital home about January 15, 1979. As noted above, Geraldine filed a petition for dissolution of the marriage on January 17, 1979. On July 6, 1979, she filed a petition in the dissolution proceeding asking the court to order Kenneth to make the past-due payments on the loan on the property in question. On September 11, 1979, Kenneth, in turn, filed a petition alleging that the home was marital property and that Geraldine had sold it and prayed that she be enjoined from transferring the proceeds of the sale. On September 13, 1979, the court ordered that $10,000 of the proceeds of the sale of the 537 Park Row property be escrowed, subject to further order of the court. It appears that the $10,000 was never placed in escrow. The petition filed by Kenneth on September 11, 1979, and the order entered September 13, 1979, both recite that the home had been sold. However, a memorandum filed by Geraldine's attorney prior to the entry of the final supplemental decree on February 4, 1981, recites that the home was sold October 2, 1979. In any event, it was sold well before the entry of the judgment of dissolution on April 1, 1980.

Since the bank would not allow Geraldine to reexecute the note, it was necessary to sell the home to avoid the costs of foreclosure. The selling price was $114,000. From these proceeds the first mortgage of $34,145.80 was paid to the bank, leaving a balance of $79,854.20. From this the balance due on the $50,000 note, which had been used to finance Kenneth's participation in a construction project, was paid. After this payment, $33,110.37 remained. The bank also deducted interest due on Geraldine's and her mother's notes, and the remaining balance of $31,861.40 was applied to her mother's, Mrs. Zugenbuehler's, note. Mr. Zugenbuehler had died. It appears that the two-thirds

interest in the land trust owned by him and his wife was held in joint tenancy and that, following his death, Mrs. Zugenbuehler had a two-thirds beneficial interest in the land trust. Thus, all of the proceeds of the sale of the 537 Park Row property had been disposed of immediately after its sale. At the time of the entry of the judgment of dissolution Geraldine had no title or interest in the property located at 537 Park Row or in the proceeds from the sale of that property. We will discuss later the effect of these facts upon the question of whether the marital home at 537 Park Row was marital property. We will first address the arguments of the parties on that question and the trial court's treatment of it.

Section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 503) directs the court to divide into marital and nonmarital portions the couple's property and to assign each spouse his or her nonmarital share. Any property purchased after the marriage but prior to the dissolution is presumptively marital property. Sections 503(a)(5) and (6) of the Act (Ill. Rev. Stat. 1979, ch. 40, pars. 503(a)(5), (6)) provide that nonmarital property includes property which a spouse acquires before the marriage and any increase in value of such property. In this case, Geraldine purchased the Park Row residence in 1967, which was several years before she married. Since this property falls within the statutory exception, it must be classified as nonmarital.

Kenneth argues, however, that his contribution to the improvement of the house and the payments on the mortgage from marital funds during the marriage transmuted the Park Row residence to marital property. In support of this theory, he relies on three cases, *In re Marriage of Rogers* (1981), 85 Ill. 2d 217; *In re Marriage of Smith* (1981), 86 Ill. 2d 518; *In re Marriage of Lee* (1981), 87 Ill. 2d 64.

These cases, in essence, hold that nonmarital property

may be presumptively transmuted to marital property. In *Rogers* we held that the placing of title to nonmarital property in joint tenancy with the spouse raised a presumption that a gift was made to the marital estate and the property thus became marital property. (*In re Marriage of Rogers* (1981), 85 Ill. 2d 217, 223.) In *Smith* we held that contributions from marital property to pay for improvements for nonmarital property likewise raised a rebuttable presumption that the property was transmuted to marital property. (*In re Marriage of Smith* (1981), 86 Ill. 2d 518, 531-33.) Similarly, in *Lee* we held that substantial improvements to a nonmarital property house, paid for with marital property, created a rebuttable presumption of transmutation. *In re Marriage of Lee* (1981), 87 Ill. 2d 64, 67.

The appellate court in our case found that Kenneth had produced no evidence that the work which he performed on the Park Row property was more than is normally required in a marriage relationship or that the work he performed increased the value of the house. The appellate court also found that Kenneth produced no evidence of the value of the family expenses which he allegedly paid and that there was no evidence that the mortgage on the home had been reduced during the marriage. Based on these findings, the appellate court considered that there had not been a transmutation of the 537 Park Row property.

The principle of transmutation is based on the presumption that the owner of the nonmarital property intended to make a gift of the property to the marital estate. (See M. Kalcheim, *Intention Controls: The Theory Of Transmutation—The Effect Of Placing Property Which Was Initially Non-Marital Into Joint Tenancy; The Theory Of Commingling—The Effect Of Intermingling Marital And Non-Marital Funds*, 68 Ill. B.J. 320 (1980).) In *Smith* we stated:

"Just as the affirmative act of transferring title will support a presumption of gift, so, too, will the affirmative

act of augmenting nonmarital property by commingling it with marital property." *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 532.

Every act of commingling or every use of marital funds for the maintenance of nonmarital property, however, should not work a transmutation. Such a strict reading of our holding in *Smith* would practically render the concept of nonmarital property illusory. The commingling of marital and nonmarital assets, and the contribution of marital assets to nonmarital property must be sufficiently significant to raise a presumption of a gift of the property to the marital estate. Thus, the making of or paying for repairs and maintenance on the house that do not materially add to its value or payments that do not reduce the indebtedness of the mortgage should not raise the presumption of transmutation. (See J. Feldman & T. Maher, *Classification Of Property Upon Dissolution Of Marriage: Suggestions For Maintaining Our "Dual System" In The Aftermath Of Smith,* 71 Ill. B.J. 100 (1982).) This reasoning seems to be the basis of the appellate court's ruling. Kenneth simply had not made adequate proof of a significant contribution.

We need not decide whether Kenneth proves sufficient contributions to raise the presumption of transmutation because we find that even if such a presumption were raised, Geraldine successfully rebutted any presumption that a gift of the house to the marital estate was intended.

As stated earlier, title to the Park Row house was held by a bank as trustee of a land trust. The beneficial interest was owned one-third by Geraldine and two-thirds by her mother and father, who was deceased at the time of the hearing. Geraldine testified that at the time one of the loans for her husband's business was negotiated, he had the bank prepare papers placing the beneficial interest in the Park Row house in her name and his name as joint tenants. When she saw the papers at the bank and asked what they were, the bank employee stated, "Mr. Olson authorized this." She responded, "Absolutely not. My parents

own that house. This is not to be done." She testified that she then went home and told her husband, "Don't you ever try that again. This is my parents' home." Geraldine's refusal to place the house in joint tenancy with her husband, her insistence that the house belonged to her parents, and the continuation of the title to her beneficial interest in her name completely rebuts any presumption that she intended to make a gift of the house or her interest in it to the marital estate.

We noted earlier that at the time the judgment of dissolution was entered, April 1, 1980, the Park Row house had been sold and all of the proceeds of the sale had been used to pay outstanding obligations. Neither party has addressed this situation in their briefs or during oral arguments.

In *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 573, this court said:

> "The Act does not purport to affect property interests during the marriage. The term 'marital property' is a nomenclature devised to realize an equitable distribution of property *upon termination of the marriage*. Operation of the term 'marital property' under the Act is not triggered *until the time of dissolution*. Section 503(b) does not prevent married persons from owning property separately during the marriage and disposing of it in any fashion that the property-owning spouse may choose." (Emphasis added.)

Under *Kujawinski* it is only the property owned at the time of the judgment of dissolution that the court may classify as marital property. Property owned separately by the spouse before that time may be disposed of as he chooses.

Public Act 82–668 (1981 Ill. Laws 3505) amended section 503 by adding a new section 503(c) and renumbering former section 503(c). Section 503(c), as amended by Public Act 82–668, provided:

> "Each spouse has a species of common ownership in

the marital property which vests at the time dissolution proceedings are commenced and continues only during the pendency of the action. ***'' (Ill. Rev. Stat. 1981, ch. 40, par. 503(c).)

The effective date of this amendment was January 1, 1982. There was a subsequent amendment to this section by Public Act 82—715 (1981 Ill. Laws 3813), effective July 1, 1982, which does not contain this provision. However, this section was further amended by Public Act 82—783 (1982 Revisory Act), which does include this provision (Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503). We need not here decide the effect of these acts. The petition for dissolution of marriage was filed by Geraldine on January 18, 1979, and the judgment of this dissolution was entered on April 1, 1980, both dates being well before the effective dates of these acts. Therefore, the holding of *Kujawinski* controls this case and the operation of the term "marital property" was not triggered until the judgment of dissolution was entered in this case on April 1, 1980. Before that date, Geraldine had sold the Park Row home, all of the proceeds of the sale had been disbursed, and there was no property derived from the Park Row house to which the nomenclature "marital property" could be applied.

On the custody question, each side leveled charges of immorality at the other. Each charged the other with financial irresponsibility and instability. Each produced expert witnesses who testified as to the weakness of the character of the other party.

As to the charges of immorality, assuming the charges Kenneth made against his wife were true, her conduct was no worse than the immoral conduct proved against Kenneth. Furthermore, Geraldine has since testified she was about to remarry and establish a home in Massachusetts where she and her new husband would live with the two sons of her former marriage and with Kristin. We see nothing in the charges of immorality that would cause the

court to prefer Kenneth over Geraldine as the custodial parent. We likewise see no reason to prefer Kenneth over Geraldine because of alleged financial obligations. Although it is alleged that there are outstanding judgments and obligations against Geraldine and her new husband, there was similar evidence concerning Kenneth.

Each expert witness attempted to depict the psychological climate surrounding the one for whom the testimony was given as favoring awarding custody to that party. However, the testimony of each expert, when read in its entirety, does not disqualify the other party or depict him or her as one unfit to have the custody of the child.

Section 602 of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 602) mandates that the court shall determine custody in accordance with the best interests of the child. This section lists six relevant factors which the court should consider. Of significance among these six factors in this case are: the wishes of the child as to his custodian, the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interests, and the child's adjustment to his home, school and community. All of the evidence was to the effect that Kristin preferred to live with her mother. Her mother testified that she was going to be married and live in Massachusetts. Geraldine was not going to be employed, and her two sons by her former marriage, with whom Kristin had been raised when Geraldine was married to Kenneth, would also live in the new home with her. There was also testimony by Geraldine about the community in which they would live in Massachusetts, the schools, and Kristin's reaction to them.

In contrast to this stable environment offered by Geraldine, the evidence showed that Kenneth was, at the time of the hearing, employed in Kentucky five days a week. He stated that this job would last several more months; that he maintained a home in Du Page County, Il-

linois, where he planned to make a home for Kristin, and that he would hire a housekeeper to care for Kristin while he worked.

The trial court, after considering all of the relevant factors, awarded custody of Kristin to her mother. The record reveals that this determination was not against the manifest weight of the evidence. We will, therefore, not reverse the trial court's determination. We think it is time Kristin is given the opportunity to establish a stable family relationship. She was a little more than seven years old when the petition to dissolve the marriage was filed on January 17, 1979. It was not until February 4, 1981, more than two years later, that the custody order was entered. Many wounds were undoubtedly inflicted upon her by this bitter litigation during that period. Since the custody order, now more than two years ago, there is every indication that she has been living with her mother, her mother's new husband, and her two brothers, with whom she had lived before. Hopefully, the wounds have had an opportunity to heal. We are not disposed to subject her to a further trauma.

The judgment of the appellate court is therefore affirmed.

*Judgment affirmed.*