2025 IL App (4th) 241115-U

NO. 4-24-1115

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
August 20, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| SAMANTHA M. SCHONERT, | ) | Circuit Court of |
| n/k/a SAMANTHA THORNE, | ) | Tazewell County |
|     Petitioner-Appellant and Cross-Appellee, | ) | No. 22DC71 |
|     and | ) | |
| SCOTT A. SCHONERT, | ) | Honorable |
|     Respondent-Appellee and | ) | Stephen A. Kouri, |
|     Cross-Appellant. | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed in part, reversed in part, vacated in part, and remanded with directions to modify the judgment and enter factual findings in compliance with section 504(b-2) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/504(b-2) (West 2022)), concluding the trial court (1) erroneously determined petitioner's 1969 Ford Mustang was marital property but properly found respondent's 1970 Chevrolet Blazer was marital property; (2) abused its discretion with respect to its maintenance decision; (3) properly divided the parties' pensions equally subject to a qualified domestic relations order; (4) did not err when it granted petitioner's motion to reconsider the denial of her request for retroactive maintenance; and (5) properly denied respondent's request for attorney fees associated with his petition for rule to show cause.

¶ 2    Petitioner, Samantha M. Schonert, n/k/a Samantha Thorne, and respondent, Scott A. Schonert, appeal and cross-appeal from a final judgment of the Tazewell County circuit court pertaining to the dissolution of their marriage. On appeal, Samantha asserts the trial court erred when it determined her 1969 Ford Mustang was marital property and denied her request for maintenance. In his cross-appeal, Scott argues the court erred when it (1) determined his 1970

Chevrolet Blazer and Samantha's 1969 Ford Mustang were marital property, (2) equally divided the parties' pensions pursuant to a qualified domestic relations order (QDRO), (3) granted Samantha's motion to reconsider the denial of her request for retroactive child support, (4) and failed to award him attorney fees associated with a petition for rule to show cause related to his damaged personal property.

¶ 3        We conclude the trial court's determination Samantha's 1969 Ford Mustang was marital property was against the manifest weight of the evidence. We further conclude the court's maintenance decision constituted an abuse of discretion because of the cumulative effect of its failure to make sufficient factual findings in compliance with section 504(b-2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(b-2) (West 2022)) and ostensible denial of maintenance as an improper sanction for Samantha's alleged misrepresentation of her retirement funds. Accordingly, we reverse the court's determination with respect to Samantha's 1969 Ford Mustang and remand with directions to modify the judgment consistent with this order. We further vacate the portion of the court's judgment regarding maintenance and remand with directions for the court to determine, based on appropriate statutory factors and the evidence already admitted at trial, whether maintenance is appropriate and to enter specific factual findings in support of its decision as required by section 504(b-2) of the Act. We affirm the court's judgment in all other respects.

¶ 4                                    I. BACKGROUND

¶ 5        Samantha and Scott were married in 1998 and have two children together: C.S. (born March 2003), an adult at the time these proceedings commenced, and T.S. (born November 2007). Samantha and Scott have both worked for Caterpillar, Inc. (Caterpillar), since July 1996 and May 1997, respectively.

¶ 6        In May 2022, Samantha filed a petition for dissolution of marriage. In December 2022, the parties reached an agreement, which allocated certain assets and debts and resolved most financial matters pertaining to the dissolution. As part of this agreement, both Samantha and Scott agreed to keep their respective individual retirement accounts (IRAs) and 401(k) accounts through Caterpillar. In August 2023, the trial court entered a parenting plan with respect to T.S., which designated Samantha as the majority parent and divided parenting time between the parties. The court also entered an order directing the parties to exchange certain personal property items within seven days of August 23, 2023. Specifically, Scott was to receive the following items from the former marital home: (1) a set of walnut nesting tables, (2) a Craftsman style hutch, (3) an art deco style floor lamp, and (4) an art deco style table lamp. However, the items were not exchanged, and in November 2023, the court entered another written order, directing the parties to make the exchange on December 6, 2023.

¶ 7                              A. Bench Trial

¶ 8        On November 6, 2023, and November 28, 2023, the trial court conducted a bench trial on the remaining issues in the case, including the allocation of four vehicles (two 1970 Chevrolet Blazers, a 1969 Ford Mustang, and a 1992 Ford Mustang) and the parties' pension plans and whether Samantha was entitled to retroactive child support and maintenance. We note that during trial, the parties agreed to sell one of the Blazers (the "project" Blazer) to Samantha's father, Tom Wick. Accordingly, only one of the Blazers is the subject of this appeal. At the outset of the hearing, Scott's counsel expressed the position that Samantha's two Ford Mustangs were her nonmarital property, while the remaining 1970 Chevrolet Blazer (show Blazer) was his nonmarital property. Samantha's position was that the show Blazer was the parties' marital property.

¶ 9                              1. *Samantha's Testimony*

¶ 10    At trial, Samantha testified she was 53 years old and prior to marrying Scott, she owned a 1992 Ford Mustang and a 1969 Ford Mustang. She purchased the 1969 model when she was 14 years old and the 1992 model when she was in her twenties. Samantha's father was a retired engineer and taught her how to build cars as a hobby.

¶ 11    Prior to their marriage, Scott purchased the show Blazer, which was originally teal blue. Over the course of their marriage, Scott made many customizations and repairs to the vehicle, including painting it black and silver and replacing the engine, transmission, suspension, and upholstery. According to Samantha, "he totally took it all the way down and totally redid it." This required the creation of a workshop space at their home, as well as the purchase of various tools and parts. Samantha testified the vehicle was in "show quality" condition. When asked whether there was anything on the show Blazer that was *not* rehabilitated or improved, Samantha replied, "No," and then later clarified, "Literally, the key." An appraiser valued the show Blazer at $60,000.

¶ 12    According to Samantha, in order to provide for C.S.'s day-to-day expenses, Samantha authorized C.S. as a user of her credit card, which C.S. used to pay for groceries and gas for her car. Samantha also paid for C.S.'s flights to and from Dublin, Ireland, for a study abroad program, which was about $1,600. Since Samantha filed her petition for dissolution of marriage, C.S. had spent $26,983.98 on Samantha's credit card for her expenses. Samantha also paid a $912 medical bill from OSF Health Care and paid both children's cell phone bills. She contributed $250 monthly to a college savings account for T.S. and paid for his sophomore school registration, field trip costs, and veterinarian bills for his pet dog. Both children were on Samantha's health, dental, and vision insurance plans, which cost $120 per month. Samantha paid for C.S.'s car insurance and recently covered the cost of new tires and vehicle registration fees. Samantha believed she was entitled to retroactive child support payments dating back to the filing of her petition for dissolution

of marriage because Scott stopped financially contributing to the family at that point.

¶ 13        On cross-examination, Samantha agreed her gross monthly income was $10,863 and Scott's was $15,200. Throughout their 25-year marriage, they primarily kept separate bank accounts. Although they consulted with one another to determine who would cover each of their expenses, they maintained their own credit cards and paid those bills separately from their respective accounts. They also contributed to their own 401(k) retirement plans through Caterpillar. The parties did not have a mortgage on the marital home, which Samantha was awarded in the dissolution. Samantha acknowledged she neglected to include her Roth IRA account on the August 2023 financial affidavit she submitted to the court. She further agreed her 401(k) through Caterpillar was worth $1,136,176, which differed from the $1 million she provided in her affidavit. On redirect examination, Samantha clarified she provided an electronic statement, which reflected that in October 2023, the account was worth $1,054,110. Samantha explained the amount fluctuated based on market conditions.

¶ 14        *2. Scott's Testimony*

¶ 15        According to Scott, he and Samantha generally maintained separate bank accounts and "split" the bills. Scott was solely responsible for paying the mortgage on the marital home and homeowner's insurance, while Samantha paid for the utilities and "ancillary" expenses. Both parties paid for groceries, but Samantha primarily purchased household items. Scott paid off the mortgage on the marital home in 2021. During the marriage, Scott contributed $750 per month to T.S.'s college savings account. According to Scott, he stopped contributing to the account when it reached a balance of around $75,000. The account's current balance was $78,771.

¶ 16        While in college and prior to his marriage to Samantha, Scott completed a full restoration of the show Blazer. After graduating from college, he "just maintained" the vehicle.

The vehicle was featured in a street truck magazine prior to the marriage. The only work Scott completed during the marriage was painting it and replacing the engine and bucket seats. Scott used his own funds from his personal bank account to complete the repairs and customizations to the show Blazer.

¶ 17 Scott testified the 1992 Ford Mustang was basically "stock" and the only work he performed on it was some repainting, stating, "[I]t's hers." On the other hand, he performed an "extensive" restoration on Samantha's 1969 Ford Mustang. At this point, Samantha's counsel objected on the ground Scott previously stipulated both Mustangs were Samantha's nonmarital property. Scott's counsel clarified this was only his position to the extent the show Blazer was also nonmarital property; if the trial court found the show Blazer was marital property, he believed both Mustangs should be classified as marital property under the same reasoning. Although Samantha and Wick initially restored the vehicle when Samantha was in high school, Scott restored it again during their marriage, about 10 years prior to trial. Specifically, as a birthday gift to Samantha, Scott "stripped it all down to the bare metal" and replaced the door skin, fenders, interior, headliner, trunk lid, vinyl top, carpet, bumpers, and paint. Wick assisted with the work and also purchased new rims and tires, and, at one point, purchased a new fuel injection system. Other than that, Scott did all the work and paid for all the parts. Scott began the work while Samantha was on vacation in France.

¶ 18 After Scott vacated the marital home, he purchased a new home with a mortgage payment of around $2,000 per month. The balance was around $430,000. Because Samantha retained the BMW Scott drove during the marriage, Scott purchased a used Ford F-150, which required him to take out a loan. When he moved out, he had to buy "everything" for his new home, including furniture and mattresses. Scott estimated he spent about $50,000 to set up his new home.

¶ 19        Scott testified both he and Samantha were fully vested in their pension plans through Caterpillar and Caterpillar had stopped contributing to the plan in 2019. Prior to the divorce, Scott intended to retire at age 55. This was no longer feasible due to the debt he incurred incident to the dissolution proceedings. The trial court allowed the admission of respondent's exhibit Nos. 19 to 22, which contained projections for each of the parties' monthly annuity from their pension plans. Because Caterpillar no longer contributed to the plan, it would not continue to increase based upon salary. Instead, the amount was determined solely by the participant's retirement date and the survivorship benefit selections. Accordingly, the projected monthly annuity was higher if the participant retired at age 60 compared to age 55. Scott's projections were higher than Samantha's because of his historically higher salary. Scott explained it was his understanding that if the pensions were divided equally subject to a QDRO, he would be required to begin collecting the pension whenever Samantha decided to do so, and vice versa. Stated differently, if Samantha decided to retire at age 55, which she had previously considered, Scott would not be able to wait until age 60 to begin collecting the higher pension amount. Scott believed the pensions should not be divided subject to a QDRO because it would prevent the parties from achieving a "true separation" from one another financially.

¶ 20        On cross-examination, Scott acknowledged "the undercarriage and the engine compartment [of the 1969 Ford Mustang] were not touched" during the restoration he performed for Samantha's birthday gift. When asked whether the work was "more cosmetic," Scott responded, "If you call a full interior and exterior restoration cosmetic, yes." Scott disagreed that some of the replaced parts, such as the chrome and headliner, could be characterized as "wear and tear" items. In contrast, Scott agreed he replaced the engine, suspension, and brakes of the show Blazer during the marriage, but "it was a show truck to begin with, and [he] just changed the colors

and the look."

¶ 21     On examination by the trial court, Scott testified he "put in a lot of time on both vehicles," referring to the show Blazer and the 1969 Ford Mustang. When asked on redirect examination if he spent the same amount of time working on the show Blazer as he did on the Mustang, he replied that it was "[p]robably within twenty percent."

¶ 22     At the conclusion of trial, the trial court directed the parties to submit their closing arguments in writing and took the remaining matters under advisement. Additionally, the court entered a written order stating the parties stipulated to the exchange of retirement (*i.e.*, pension) valuation packages prepared by their respective experts and directing them to file the same within seven days. Scott's expert valued Samantha's and Scott's pensions at $402,000 and $589,000, respectively. Samantha's expert valued Samantha's and Scott's pensions at $460,000 and $660,000, respectively.

¶ 23                                B. Judgment

¶ 24     On December 13, 2023, the trial court entered a bifurcated judgment of dissolution of marriage, reserving judgment on the remaining financial matters. Following the parties' written arguments, the court entered an order on December 29, 2023, resolving the remaining issues, as relevant to this appeal, as follows. The court determined the show Blazer and the 1969 Ford Mustang were marital property and the 1992 Ford Mustang was Samantha's nonmarital property. The court ordered that if the parties could not agree on the vehicles' values and offsets, they were to be sold, with the proceeds to be split equally. Additionally, the marital portion of the parties' pensions from Caterpillar were to be divided equally, subject to a QDRO to effectuate the same. The court's ruling with respect to maintenance was as follows: "Under the factors listed in [section] 504(a) [of the Act], maintenance is not appropriate in this case. In this regard, the court

- 8 -

notes the inaccurate financial affidavit filed by [Samantha] as it relates to retirement accounts." Finally, the court denied Samantha's request for Scott to contribute to expenses related to support for C.S.

¶ 25          C. Motion to Reconsider and Petition for Rule to Show Cause

¶ 26          Following the trial court's December 29, 2023, order, Samantha filed a motion to reconsider the portions of the order that denied her maintenance and retroactive child support.

¶ 27          On March 14, 2024, Scott filed a petition for rule to show cause asserting that when he went to the marital residence on December 6, 2023, to retrieve his personal property pursuant to the trial court's November order, the items had been exposed to the elements and had been damaged. Scott claimed that due to Samantha's "willful and intentional" actions, the items had greatly depreciated in value and would cost $5,300 to replace. Scott requested reimbursement for the cost of replacing the damaged property, as well as attorney fees and costs associated with the preparation of the petition for rule to show cause. Scott attached an affidavit to the petition for rule to show cause averring the same.

¶ 28          On April 3, 2024, the trial court held a hearing on Scott's petition for rule to show cause and Samantha's motion to reconsider. At the hearing, Scott testified consistently with the affidavit he attached to his petition for rule to show cause. Additionally, the court allowed the admission of respondent's group exhibit A, which contained photographs showing the damage to the items, as well as examples of similar items for sale on eBay with their respective list prices. Scott requested $5,300 to cover the replacement of the items and attorney fees and costs associated with preparing the petition for rule to show cause. In turn, Samantha testified she attempted to have Scott pick up his items "numerous times" following the court's August 2023 order. During that period, the items were inside the home but were eventually moved into the garage. Samantha

explained the court's initial order directing them to exchange the items on August 23, 2023, did not work for her because she was leaving for Ireland the next day to bring C.S. to her study abroad program, a trip of which Scott was well informed. Upon her return, Samantha asked Scott to pick up his items several times, suggesting various dates and times, to which Scott did not respond. At some point, Samantha considered the items abandoned and moved them outside beneath the overhang of the garage, stating, "They were not mine anymore." The parties eventually made the exchange on December 6, 2023, pursuant to the November order. At the conclusion of the hearing, the court ordered Samantha to compensate Scott $2,650 for his damaged property, stating as follows:

> "All right. I'm going to award half of the $5300, and *** I'm not interested in whether the parties like the order or not, but I find false [*sic*] on both [parties]' side. I would not find any fault on Samantha's side on this if she had not put it outside."

The court took the remaining issues under advisement.

¶ 29   On May 7, 2024, the trial court entered a written order addressing Samantha's motion to reconsider. The court confirmed its denial of Samantha's request for maintenance, citing factors (2), (7), (10), and, "most importantly," (14) of section 504(a) of the Act (750 ILCS 5/504(a)(2), (7), (10), (14) (West 2022)). After the citation to section 504(a)(14) of the Act, the court wrote, "(*i.e.*, misrepresentation of retirement accounts by [Samantha])." The court did not make any other specific findings with respect to the statutory maintenance factors. However, the court awarded Samantha retroactive child support dating back to March 15, 2023, in the amount of $935 per month. The court denied Samantha's motion in all other respects.

¶ 30   On July 2, 2024, the trial court entered a final judgment incorporating and memorializing all its previous rulings.

¶ 31          This appeal and cross-appeal followed.

¶ 32                           II. ANALYSIS

¶ 33          On appeal, Samantha argues the trial court erred when it (1) determined the 1969 Ford Mustang was marital property and (2) denied her request for maintenance. Scott agrees the court erroneously determined the 1969 Ford Mustang was marital property (with the caveat the show Blazer is also his nonmarital property by the same logic) but responds the court properly denied Samantha's request for maintenance.

¶ 34          In his cross-appeal, Scott argues the trial court erred when it (1) determined both the 1969 Ford Mustang and show Blazer were marital assets, (2) ordered the parties' pensions be divided equally subject to a QDRO, (3) granted Samantha's motion to reconsider the court's denial of retroactive child support, and (4) did not award him attorney fees and costs or the full value he requested associated with his petition for rule to show cause. Samantha responds the court correctly determined the show Blazer was a marital asset and properly divided the parties' pensions. She further asserts the court's award of retroactive maintenance was proper but that it should have backdated the award to May 2022, when she filed the petition for dissolution of marriage. Finally, Samantha argues the court erred when it awarded Scott compensatory damages for his personal property.

¶ 35                      A. Allocation of Vehicles

¶ 36          We first address the parties' arguments with respect to the allocation of the show Blazer and the 1969 Ford Mustang. Samantha asserts the trial court incorrectly determined the 1969 Ford Mustang was marital property. Scott, in turn, argues the court erroneously determined both the 1969 Ford Mustang and his show Blazer were marital property.

¶ 37          In a marriage, all the property of the parties belongs to one of three estates: the

estates of the two individual spouses and the marriage itself. *In re Marriage of Johns*, 311 Ill. App. 3d 699, 702 (2000). "Before a court may distribute property upon the dissolution of a marriage, the court must first classify the property as either marital or nonmarital." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. The trial court's determination as to the classification of property will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence only if the opposite conclusion is readily apparent. *Id.*

¶ 38    Section 503(a) of the Act provides, in pertinent part, as follows:

"(a) For purposes of this Act, 'marital property' means all property, including debts and other obligations, acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

(1) property acquired by gift, legacy or descent or property acquired in exchange for such property;

* * *

(6) property acquired before the marriage, except as it relates to retirement plans that may have both marital and non-marital characteristics;

***

(7) the increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section." 750 ILCS 5/503(a)(6), (7) (West 2022).

In turn, section 503(c) states as follows:

"(c) Commingled marital and non-marital property shall be treated in the following

manner, unless otherwise agreed by the spouses:

(1)(A) If marital and non-marital property are commingled by one estate being contributed into the other, the following shall apply:

(i) If the contributed property loses its identity, the contributed property transmutes to the estate receiving the property, subject to the provisions of paragraph (2) of this subsection (c).

(ii) If the contributed property retains its identity, it does not transmute and remains property of the contributing estate.

\*\*\*

(2)(A) When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence or that was a gift. The court may provide for reimbursement out of the marital property to be divided or by imposing a lien against the non-marital property that received the contribution.

(B) When a spouse contributes personal effort to non-marital property, it shall be deemed a contribution from the marital estate, which shall receive reimbursement for the efforts if the efforts are significant and result in substantial appreciation to the non-marital property except that if the marital estate reasonably has been compensated for his or her efforts, it shall not be deemed a contribution to the marital estate and there shall be no

- 13 -

reimbursement to the marital estate. The court may provide for reimbursement out of the marital property to be divided or by imposing a lien against the non-marital property which received the contribution." *Id.* § 503(c).

¶ 39 The parties agree that under section 503(a)(6) of the Act, both the 1969 Ford Mustang and the show Blazer were initially the parties' respective nonmarital property because they were both purchased prior to the marriage and both parties always retained the titles to the respective vehicles individually. The record does not reflect the trial court made any specific findings regarding either vehicle, only that it ultimately determined both were marital property. The question is whether, under section 503(c), the improvements made to the vehicles during the marriage constituted a commingling of marital and nonmarital property such that a loss of identity occurred and resulted in the transmutation of the nonmarital property into marital property.

¶ 40 "The principle of transmutation is based on the presumption that the owner of the nonmarital property intended to make a gift of the property to the marital estate." *In re Marriage of Olson*, 96 Ill. 2d 432, 439 (1983). "Every act of commingling or every use of marital funds for the maintenance of nonmarital property, however, should not work a transmutation." *Id.* at 440. "The commingling of marital and nonmarital assets, and the contribution of marital assets to nonmarital property must be sufficiently significant to raise a presumption of a gift of the property to the marital estate." *Id.* at 439. "[E]ven if a significant contribution were to be established, the presumption of transmutation created by the contribution may be rebutted with evidence that a gift of the nonmarital property was not intended." *In re Marriage of Aud*, 142 Ill. App. 3d 320, 330 (1986). Accordingly, the first question is whether commingling occurred. We address each vehicle in turn.

¶ 41　　　　Turning to Samantha's 1969 Ford Mustang, we conclude the trial court's determination it was marital property was against the manifest weight of the evidence. Initially, we note counsel for both parties consistently advised the court the 1969 Ford Mustang was Samantha's nonmarital party. Scott's counsel only contested this classification once the question of the show Blazer arose, at which point the argument became whichever classification applied to one should also apply to the other. Additionally, we acknowledge both parties testified Scott used marital funds to purchase tools and parts to improve and repair the vehicle, which normally would constitute commingling of marital and nonmarital assets under section 503(c) of the Act. See 750 ILCS 5/503(c) (West 2022). However, Scott's unrebutted testimony was that he performed said work as a birthday gift for Samantha, which he began while she was on vacation in France. Under section 503(a) of the Act, gifts received during the marriage are considered the individual's nonmarital property. *Id.* § 503(a). Accordingly, it was readily apparent from the record the 1969 Ford Mustang was Samantha's nonmarital property and any improvements also constituted her nonmarital property.

¶ 42　　　　Turning to Scott's show Blazer, we conclude the trial court's determination it was marital property was not against the manifest weight of the evidence. The evidence showed Scott used marital funds to purchase the parts and tools used to repair and improve the show Blazer in the workshop of the marital home, which constituted a commingling of marital assets into his nonmarital estate under section 503(c)(1)(A) of the Act. See *id.* § 503(c)(1)(A). Although the court did not specify how it concluded the Blazer was marital property, its decision leads to an inference that it believed Scott's contribution of marital assets to the vehicle was so "significant" that it raised a presumption of a gift of the vehicle to the marital estate under *Olson*, 96 Ill. 2d at 440. Unlike the Mustang, where there was uncontroverted evidence Scott's improvements were a gift

to Samantha's nonmarital estate, here, there was no such evidence about the show Blazer. Scott also failed to offer any evidence to overcome the presumption that despite the significant contribution of marital assets to his nonmarital property, he did not intend a gift of the vehicle to the marital estate. See *Aud*, 142 Ill. App. 3d at 330. Moreover, the court was in the best position to ascertain the credibility of the witnesses' testimony on this issue. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). Accordingly, the court could have reasonably found Samantha's testimony that everything but the key had been repaired, altered, replaced, or modified such that the original vehicle was no longer identifiable and had therefore transmuted. Additionally, unlike Scott's shifting position with the Mustangs, Samantha disputed the classification of the show Blazer throughout the proceedings. Accordingly, a finding the show Blazer was nonmarital property is not readily apparent here.

¶ 43       In sum, we conclude the trial court's finding Samantha's 1969 Ford Mustang was nonmarital property was against the manifest weight of the evidence. However, the court properly determined the show Blazer was marital property. Accordingly, we reverse in part and remand with directions to modify the judgment consistent with this order.

¶ 44                            B. Denial of Maintenance

¶ 45       We next address Samantha's claim the trial court erred when it denied her request for maintenance. Scott responds the court did not err in denying Samantha's request for maintenance. We conclude the court's maintenance decision was an abuse of discretion.

¶ 46       Under section 504(a) of the Act (750 ILCS 5/504(a) (West 2022)), the trial court may grant a maintenance award "in amounts and for periods of time as the court deems just." In determining whether to award maintenance, the court is to consider the following factors:

          "(1) the income and property of each party, including marital property

- 16 -

apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable."

*Id.* § 504(a)(1)-(14).

"In considering these factors, the trial court is not required to give them equal weight so long as the balance struck by the court is reasonable under the circumstances." (Internal quotation marks omitted.) *In re Marriage of Bradley*, 2011 IL App (4th) 110392, ¶ 36. Furthermore, the court is required to make "specific" findings of fact in each case involving the issue of maintenance, and it "shall state its reasoning for awarding or not awarding maintenance," with references to "each relevant factor" set forth in section 504(a). 750 ILCS 5/504(b-2) (West 2022).

¶ 47          This court will not disturb the trial court's award or denial of maintenance absent an abuse of discretion. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 74. "A clear abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009).

¶ 48          Here, we conclude the trial court's maintenance decision constituted an abuse of discretion based on the cumulative effect of two errors. First, the court failed to make sufficiently specific factual findings overall in support of its decision, as required by section 504(b-2) of the Act (750 ILCS 5/504(b-2) (West 2022)). In its initial order, the court did not cite any single maintenance factor. Although the court cited factors of section 504(a)(2), (7), (10), and (14) of the Act upon its denial of Samantha's motion to reconsider, it did not relate those factors to any of the

evidence presented in this case, except for the alleged misrepresentation of Samantha's Caterpillar 401(k) retirement account and the omission of the Solid Rock accounts from her financial affidavit. This does not satisfy the requirement of section 504(b-2) to state the reasoning for awarding or denying maintenance. 750 ILCS 5/504(b-2) (West 2022). Although Scott cites cases providing that the trial court is not required to make specific findings as to its maintenance decision (see, *e.g.*, *Blum*, 235 Ill. 2d at 37-38), these cases preceded amendments to the Act requiring the entry of such findings. See Pub. Act 98-961 (eff. Jan. 1, 2015) (adding 750 ILCS 5/504(b-2)). Second, the only factual finding the court *did* make, which it found to be most important to its decision, was that Samantha misrepresented the nature of her retirement accounts. However, the parties agreed upon the distribution of Samantha's Caterpillar 401(k) account and the Solid Rock accounts, and the court approved this portion of their property settlement in the December 2022 order. Unlike the parties' pensions, Samantha's retirement accounts were not subject to distribution at the final hearing. Moreover, the court failed to explain how the misrepresentation of these previously awarded assets correlated to its decision to deny Samantha maintenance. Although the court was permitted to consider any factor it found to be relevant under section 504(a)(14) of the Act, this court is concerned that—as the only factual finding the court made, and without any explanation as to *how* the court considered this information in its maintenance determination—the court's order reads as an impermissible denial of maintenance as a penalty for Samantha's omission of the Solid Rock accounts from her financial affidavit and incorrect statement of the value of her Caterpillar 401(k). While the court, in its discretion, could have issued an appropriate sanction based on an alleged misrepresentation to the court, a denial of maintenance would not be commensurate to that transgression.

¶ 49        We conclude the cumulative effect of the trial court's failure to make sufficiently

specific factual findings overall, combined with our concern regarding the propriety of the only factual finding it did make as an improper penalty, renders the court's maintenance determination arbitrary and unreasonable. Accordingly, we vacate the portion of the court's judgment regarding maintenance and remand with directions for the court to (1) determine whether maintenance is appropriate based on appropriate statutory factors and the evidence *already admitted* at trial and (2) enter factual findings in support of its decision and in compliance with section 504(b-2) of the Act. To be clear, upon remand, the court is to consider only the evidence previously admitted at trial, and the parties are not being granted a new hearing or the opportunity to submit new evidence. The remand is for compliance with statutory requirements.

¶ 50                                    C. Division of Pensions

¶ 51        Next, Scott argues the trial court abused its discretion when it ordered the equal division of the marital portion of the parties' pensions subject to a QDRO. Instead, Scott asserts the parties should be permitted to retain their own pensions without contribution from one another. Samantha initially responds Scott waived this argument when he previously agreed to "split" the entire marital estate equally. Alternatively, Samantha contends no abuse of discretion occurred and the court's equal division of the parties' pensions was proper. We find Samantha's argument that Scott waived this argument unpersuasive and conclude the court's equal division of the pensions subject to a QDRO was not an abuse of discretion.

¶ 52                                          1. *Waiver*

¶ 53        We first address Samantha's argument Scott waived this issue when he previously agreed to split the marital estate equally. In support of this argument, Samantha cites a portion of the record where Scott's counsel agreed, when queried by the trial court, that the general goal of the parties was to split the marital assets equally.

¶ 54 "Waiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right." *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 326 (2004).

¶ 55 Here, Scott's counsel's agreement that the parties' general goal was to split marital assets evenly did not amount to an intentional relinquishment of his right to oppose the equal division of parties' pensions subject to a QDRO. The parties had previously resolved many of the financial, property, and parental issues incident to the dissolution proceedings, which were memorialized in the December 2022 judgment and pursuant to which Samantha paid Scott a $200,000 equalization. However, the parties agreed to reserve ruling on the division of their pensions, the allocation of certain vehicles, and maintenance, which Scott's counsel characterized as "stand-alone issues." Accordingly, we proceed to the merits of Scott's argument.

¶ 56                                     2. *Applicable Law*

¶ 57 Ultimately, "[t]he touchstone of proper apportionment [of marital assets] is whether it is equitable, and each case rests on its own facts." *Romano*, 2012 IL App (2d) 091339, ¶ 121. Additionally, the Act, "whenever possible, seeks to cut off all entanglements between the parties so that they may each go their separate ways in life." *In re Marriage of Simmons*, 87 Ill. App. 3d 651, 659 (1980).

¶ 58 Under section 503(b)(2) of the Act (750 ILCS 5/503(b)(2) (West 2022)), pension plans acquired by or participated in after the marriage and before dissolution are presumed to be marital property. A party's right to a division of pension benefits in "just proportions" under section 503(b)(2) of the Act is enforceable under section 1-119 of the Illinois Pension Code (40 ILCS 5/1-119 (West 2022)), which provides for the entry of a QDRO. 750 ILCS 5/503(b)(2) (West 2022). "Generally, the distribution of marital assets, including pension plans, lies within the sound

discretion of the trial court, and this court will not disturb the trial court's decision absent an abuse of that discretion." *In re Marriage of Blazis*, 261 Ill. App. 3d 855, 862 (1994). To that end, "[t]he choice of the method of apportioning the present value of the marital property interest in the retirement benefits to which a spouse is entitled is similarly a matter left to the discretion of the trial court." *In re Marriage of Korper*, 131 Ill. App. 3d 753, 757 (1985).

¶ 59　　　　However, "[p]ension plans are often difficult to value because the amount of benefits that will actually be received depends on future contingencies." *In re Marriage of Ramsey*, 339 Ill. App. 3d 752, 758 (2003). Accordingly, Illinois courts have developed two methods of distributing pension benefits: (1) the "present value" or "immediate offset" approach and (2) the reserved jurisdiction approach. *In re Marriage of Culp*, 399 Ill App. 3d 542, 546-47 (2010).

¶ 60　　　　Under the immediate offset method, the trial court "determines the present value of the pension plan, awards the entire pension to the employed party, and awards the other party enough other marital property to offset the pension award." *Ramsey*, 339 Ill App. 3d at 758. This method is only feasible where "there is sufficient actuarial evidence to determine the present value of the pension, when the employee spouse is close to retirement age, and when there is sufficient marital property to allow an offset." *Robinson v. Robinson*, 146 Ill. App. 3d 474, 476 (1986).

¶ 61　　　　In contrast, the reserved jurisdiction method is designed to alleviate "the inequities inherent in being unable to determine the present value of the plan benefits." *Id.* "Under this method, the court orders the employee spouse to pay an allocated portion of the pension fund to the former spouse, as it is disbursed, while retaining jurisdiction to enforce the decree." *Id.* The court determines the marital portion of the pension using a fraction, "the numerator of which is the number of years or months that the employee-spouse contributed to the pension plan during the marriage and the denominator of which is the total number of years or months the employee-spouse

contributes to the plan." *Ramsey*, 339 Ill. App 3d at 758. At the time the employee spouse begins collecting the pension benefits, the amount the payee spouse receives is then multiplied by this fraction and divided according to the court's determination at the time of dissolution. *Id.*

¶ 62                                    3. *This Case*

¶ 63        In this case, the trial court allocated both Samantha and Scott, as employee spouses, one half of the marital portion of the other's pension, to be effectuated via a QDRO. Scott contends this constituted an abuse of discretion because the facts of this case favored the use of the immediate offset approach. Specifically, Scott asserts he and Samantha are both near retirement age and because they are both fully vested in their pensions, there is sufficient actuarial data to determine their present values. Moreover, Scott's argument continues, it would not be equitable to order Scott to pay an offset to Samantha because she was allocated several vehicles and the marital home, while he had to take out hundreds of thousands of dollars in loans to purchase a new home and new vehicle, as well as incurring significant expenses to furnish the new home. Therefore, Scott requests this court order he and Samantha be allocated their respective pensions without contribution from the other.

¶ 64        In support of his argument, Scott cites *In re Marriage of Leitzen*, 2023 IL App (4th) 220770-U, an unpublished decision of this court that he cites as persuasive authority. Samantha contends *Leitzen* is distinguishable and is not persuasive under the facts of this case. In *Leitzen*, the wife was 56 years old—eight years older than the husband—and had worked for 30 years as the primary breadwinner of the marriage. *Id.* ¶ 8. She was set to retire approximately one month from the date of the final hearing in the proceedings, at which time she would begin collecting a pension of $2,000 per month. *Id.* ¶¶ 9, 73. Following trial, the court ordered the wife was entitled to keep her pension without contribution to the husband but would pay him an equalization

payment from her 401(k) upon dissolution of the marriage. *Id.* ¶ 38. On appeal, the husband argued the trial court abused its discretion when it awarded the wife her entire pension. *Id.* ¶ 70. This court disagreed and affirmed, concluding the court was not required to divide the pension for its distribution of marital assets to be equitable. *Id.* ¶ 73. This court emphasized the wife's monthly pension was comparable to the husband's claimed monthly income and the husband had many years to continue working if he decided to retire at the same age as the wife. *Id.*

¶ 65        We agree with Samantha the instant case is distinguishable from *Leitzen* in several respects. Significantly, the wife in that case had already elected to retire, the date of which was one month away from the final hearing in the proceedings, and the pension amount was already determined and processed for payment status. *Id.* ¶¶ 9, 73. In contrast, although the parties here could theoretically retire within the next few years and begin collecting their pensions, neither party testified they would be retiring soon, despite Scott's testimony Samantha had previously mentioned wanting to retire "early." A stated desire to retire early does not equate to an intention or plan to do so. Moreover, the husband in *Leitzen* was eight years younger than the wife and had many years to continue working and saving for retirement, while the wife would be relying on her pension as her primary source of income until she was eligible for social security. Here, the parties are close in age and will have similar working years left if they elect to retire at the traditional social security retirement age, which is 67.

¶ 66        We conclude the trial court did not abuse its discretion when it chose to equally divide the marital portion of the parties' pensions subject to a QDRO rather than the immediate offset approach. First, Scott's contention the parties are "near" retirement age is dubious where neither party expressed a concrete intention to retire soon and the standard social security retirement age is 67—an age neither party will reach for over a decade. Moreover, although the

parties submitted actuarial evidence from their respective experts containing present valuations of their pensions, the court was permitted to assess the limitations of these valuations and conclude it was not satisfied with the methodology employed therein or was otherwise concerned with factors such as inflation and life expectancy. Additionally, while an immediate offset approach may further the Act's goal of ending future entanglements between the parties where possible, the court's *primary* concern is the equitable division of the assets. See *Romano*, 2012 IL App (2d) 091339, ¶ 121. Even under circumstances where the immediate offset method is feasible, the court is within its discretion to employ a different method if it would achieve a more equitable result. We conclude the court's decision was not arbitrary or unreasonable and no abuse of discretion occurred regarding the division of the parties' pensions.

¶ 67                                    D. Retroactive Child Support

¶ 68          We next address Scott's contention the trial court erred when it granted Samantha's motion to reconsider its denial of her request for retroactive child support. Specifically, Scott contends the court's initial decision was not erroneous and Samantha failed to meet her burden of showing newly discovered evidence, a change in the law, or an error in the court's application of existing law required the court to reconsider its ruling. Samantha responds the court properly granted her motion to reconsider where it misapplied the law regarding retroactive child support. Samantha further argues the court should have backdated its award to the date she filed her petition for dissolution of marriage (May 2022) rather than the date Scott moved out of the marital home.

¶ 69          First, to the extent Samantha attempts to argue the trial court erroneously backdated its retroactive child support order to March 15, 2023, instead of the date she filed her petition for dissolution of marriage, we conclude she forfeited this argument by failing to raise it in her opening brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are waived and shall not

- 25 -

be raised in the reply brief."); see also *In re Marriage of Kasprzyk*, 2019 IL App (4th) 170838, ¶ 40. Accordingly, we address only whether the court erred when it granted Samantha's motion to reconsider and awarded retroactive maintenance to March 15, 2023.

¶ 70 The purpose of a motion to reconsider is "is to bring to the trial court's attention (1) newly discovered evidence not available at the time of the hearing, (2) changes in the law, or (3) errors in the court's previous application of existing law." (Emphasis and internal quotation marks omitted.) *In re Marriage of Rogers*, 2015 IL App (4th) 140765, ¶ 61. Generally, "[t]he decision to grant or deny a motion to reconsider lies within the trial court's discretion, and we will not disturb the court's ruling absent an abuse of discretion." *Stringer v. Packaging Corp. of America*, 351 Ill. App. 3d 1135, 1140 (2004). However, where a party's motion for reconsideration is based solely on an alleged misapplication of existing law, rather than newly discovered evidence or legal theories not presented at trial, this court's review is *de novo*. *Bank of America, N.A. v. Ebro Foods, Inc.*, 409 Ill. App. 3d 704, 709 (2011).

¶ 71 Under section 505(a) of the Act, "the court may order either or both parents owing a duty of support to a child of the marriage *** to pay an amount reasonable and necessary for support." 750 ILCS 5/505(a) (West 2022). This "includes the obligation to provide for the reasonable and necessary physical, mental and emotional health needs of the child." *Id.* "Retroactive allowance of [child] support in a dissolution proceeding is within the discretionary power of the trial court if such allowance is deemed fit, reasonable and just." *In re Marriage of Rogliano*, 198 Ill. App. 3d 404, 410 (1990); see *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 1119 (2004).

¶ 72 Samantha's motion to reconsider was based on the premise the trial court misapplied the law. Specifically, Samantha alleged the court's failure to award "arrearages" was a

deviation from the statutory guidelines set forth in section 505(a) of the Act and its failure to set forth its findings in support of such a deviation required reversal under section 505(a)(2) of the Act (see 750 ILCS 505(a)(2) (West 2022) (requiring the court to make certain findings before deviating from statutory support guidelines)). Generally, an "arrearage" is defined as "the total amount of unpaid support obligations, including interest, as determined by the court and incorporated into an order for support." 750 ILCS 28/15(b) (West 2022); *In re Marriage of Thompson*, 357 Ill. App. 3d 854, 862 (2005).

¶ 73 Samantha's motion to reconsider misunderstood and misstated the law regarding retroactive child support. To begin, Samantha's motion conflated retroactive support with "arrearages," which are separate and distinct matters. Scott cannot have accumulated any arrearage from the period of May 2022 (when Samantha filed her petition for dissolution) to August 2023 because there was no order of support in place at that time for him to have failed to meet his obligation. Furthermore, there is no "statutory guideline" requiring an award of retroactive support merely because child support has been ordered at some point during the dissolution proceedings; a court's denial of a request for retroactive support does not constitute a deviation from statutory guidelines. As explained *supra* ¶ 71, retroactive support is a matter of the trial court's discretion and appropriate where the court deems fit, reasonable, and just. *Rogliano*, 198 Ill. App. 3d at 410. Accordingly, we conclude Samantha's motion to reconsider itself did not state a legally meritorious argument the court misapplied the law regarding retroactive child support.

¶ 74 However, Scott has not demonstrated the trial court was not permitted to determine, on its review of the law and the evidence, it erred when it denied Samantha's initial request for retroactive child support. In the absence of a showing to the contrary, this court presumes the trial court knows the law and applies it accordingly. See *In re Marriage of Jessica F.*, 2024 IL App

(4th) 231264, ¶ 51. Here, the court did not provide its reasoning for granting Samantha's motion to reconsider in its written order but later explained on the record it had chosen the date Scott moved out of the marital home for the award of retroactive support to apply. Based on this comment, the court likely determined it had misapplied the law regarding retroactive child support and it would not be "fit, reasonable [or] just," for Samantha to be without financial support for T.S. during the period after Scott moved out of the marital home and before the support order was entered. See *Rogliano*, 198 Ill. App. 3d at 410. Accordingly, we conclude the court did not err when it granted Samantha's motion to reconsider the denial of her request for retroactive child support.

¶ 75 Scott alternatively argues if this court is to affirm the trial court's award of retroactive child support, we must apply the statutory guidelines to the same. See 750 ILCS 5/505(a)(1.5) (West 2022). Scott asserts that from the period of March 15, 2023, to August 14, 2023, when the parenting plan was entered, the parties shared parenting time, wherein Scott had six overnights with T.S. every two weeks, for a total of 156 per year. Based on their incomes during this time ($15,200 and $10,863 for him and Samantha, respectively), Scott claims the statutory support figure should have been $568 per month. We disagree. Here, the trial court entered an order in August 2023 ordering Scott to pay $935 per month in support to Samantha, a deviated figure which the parties had agreed upon and which the court presumably found to be in T.S.'s best interest. See 750 ILCS 5/505(a)(2) (West 2022). Scott does not explain why that best interest finding does not equally apply to the period after he moved out of the marital home and before the August 2023 order was entered and therefore should not also apply to the award of retroactive child support, other than that the parties shared parenting time during this period. In the absence of any suggestion the court's previous determination was not in T.S.'s best interest or otherwise

an abuse of discretion as applied to the period of March 15, 2023, to August 14, 2023, we decline to disturb it on appeal. See, *e.g.*, *In re Marriage of Sobieski*, 2013 IL App (2d) 111146, ¶ 53 (holding an award of child support is reviewed for an abuse of discretion). Accordingly, we decline to alter the court's retroactive child support award.

¶ 76                    E. Attorney Fees and Petition for Rule to Show Cause

¶ 77          Finally, Scott argues the trial court erred when it ordered Samantha to compensate him only $2,650 for his damaged personal property, which was less than the $5,300 he requested. Samantha responds the court erred in awarding Scott compensatory damages because Scott intentionally prevented Samantha from complying with the court's initial order to exchange the personal property.

¶ 78          Again, to the extent Samantha attempts to argue the trial court erred in ordering her to pay Scott $2,650, we conclude she forfeited this argument by failing to raise it in her opening brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Kasprzyk*, 2019 IL App (4th) 170838, ¶ 40. Accordingly, we address only whether the court erred when it awarded Scott $2,650 in damages instead of the $5,300 he requested.

¶ 79          In his brief, Scott seems to focus on the issue of whether he was entitled to attorney fees under section 508(b) of the Act (750 ILCS 5/508(b) (West 2022)), but he also claims this entitles him to the full replacement value of his personal property. That section provides as follows:

> "In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party." *Id.*

Scott also cites to language regarding the standard of review for indirect civil contempt. See *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984) ("[W]hether a party is guilty of contempt is a question of fact for the trial court, and that a reviewing court will not disturb the finding unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion."). However, Scott also acknowledges he never asked for a finding of contempt and the trial court did not make one. Because this was not a contempt proceeding, we conclude Scott's citation to the standard of review for a contempt finding is inapposite here, but we nonetheless agree that we will generally not disturb the trial court's factual findings unless they are against the manifest weight of the evidence (*In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 46) and the court's decision whether to award attorney fees is reviewed for an abuse of discretion (*In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005)).

¶ 80    We conclude the trial court did not abuse its discretion when it did not award Scott attorney fees under section 508(b) because it never made a finding that Samantha failed to comply with its August 2023 property exchange order "without compelling cause or justification." In fact, its statement that it would not have found "any fault on Samantha's side" if she had not put the items outside supports an inference it believed she had a compelling reason not to comply with its initial order—*i.e.*, her trip to Ireland. The court seemed to also believe Scott was partially at fault for the exchange not taking place sooner because he refused to respond to Samantha upon her return from Ireland. The court was in the best position to assess the credibility of the witnesses on this issue (see *Bates*, 212 Ill. 2d at 515), and we find nothing in the record compels a finding the opposite conclusion was readily apparent. Accordingly, the court's factual finding was not against the manifest weight of the evidence and its decision not to award attorney fees under section 508(b) was not an abuse of discretion.

¶ 81 Regarding whether the trial court erred when it failed to compensate him for the claimed full value of his personal property, Scott fails to provide any citations to caselaw or other authority to support his claim, other than the attorney fee provision of section 508(b) of the Act and precedent related to indirect civil contempt. As noted above, this was not a civil contempt proceeding and section 508(b) of the Act only provides for awards of attorney fees. Moreover, a finding of civil contempt would not have entitled Scott to compensatory damages. *In re Marriage of Morreale*, 351 Ill. App. 3d 238, 244 (2004). In the absence of any other authority to support his claim, it is not this court's obligation to act as an advocate to seek error in the record, and we will not do so here. *In re Marriage of Katsap*, 2022 IL App (2d) 210706, ¶ 143. Accordingly, we affirm the court's award of $2,650.

¶ 82                                    III. CONCLUSION

¶ 83 For the reasons stated, we reverse the trial court's determination classifying Samantha's 1969 Ford Mustang as marital property and remand with directions to modify the judgment consistent with this order. We vacate the portion of the judgment with respect to maintenance and remand with directions for the court to determine whether maintenance is appropriate based on appropriate statutory factors and evidence already admitted at trial and to enter its findings in support of its decision in compliance with section 504(b-2) of the Act. We affirm the judgment in all other respects.

¶ 84 Affirmed in part; reversed in part; vacated in part; cause remanded with directions.